## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>PROG LEASING, LLC, a limited liability company, also d/b/a Progressive Leasing,<br><br>    Defendant. | Case No. _____<br><br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendant's acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with the marketing, offering for sale, and sale of rent-to-own payment plans.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. § 53(b).

## DEFENDANT

6.      Defendant Prog Leasing, LLC, also doing business as Progressive Leasing, ("Progressive") is a Delaware limited liability company with its principal place of business at 256 West Data Drive, Draper, Utah 84020.  Progressive

transacts or has transacted business in this District and throughout the United States.

7.     Progressive employs regional sales employees in this District and contracts with retailers located in this District.  Georgia is one of the top five states in terms of number of Progressive consumers.  More than 200,000 Progressive consumers reside in Georgia.  In addition, Progressive's parent company, Aaron's, Inc., is a Georgia corporation headquartered in this District.

## COMMERCE

8.     At all times material to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS PRACTICES

9.     Defendant markets and sells rent-to-own payment plans to consumers at traditional brick-and-mortar and online retailers, including several prominent national retailers.

10.     In numerous instances, Defendant has induced consumers to enter into rent-to-own payment plans by misrepresenting that consumers will pay only the retail, cash, or "same as cash" price to purchase merchandise through Progressive

when, in most instances, Defendant charges consumers substantially more than the retail price.

11.     Defendant has received tens of thousands of complaints from consumers who were misled about the cost of Progressive's rent-to-own products, including more than 15,000 complaints in a single 15-month period.  Despite being aware of widespread consumer confusion, Defendant continues to employ the same practices to lure consumers.

### Background on Progressive

12.     Progressive is a provider of so-called "virtual" rent-to-own services. Unlike traditional rent-to-own companies, Progressive does not operate its own brick-and-mortar stores.  Instead, Defendant markets Progressive's rent-to-own payment plans to consumers shopping at certain retailers' stores or websites, primarily those in the furniture, appliance, jewelry, mattress, automobile electronics, and mobile phone industries.

13.     Defendant markets rent-to-own payment plans at more than 24,000 retail locations in 46 states and the District of Columbia.

14.     Many of these retail stores market a variety of third-party financing offers, including some that allow consumers to pay for merchandise over time

4

without paying any additional fees, charges, or costs over the retail price (*e.g.*, no interest if paid in full within 12 months).

**Defendant Misrepresents the Cost of Its Rent-to-Own Products**

15.    Because Progressive does not operate its own brick-and-mortar stores, many consumers are not familiar with Progressive or its rent-to-own payment plans when they go to a retail store or website to shop for merchandise.  Nor do they typically arrive at the store specifically to purchase merchandise using a rent-to-own payment plan.

16.    The first price many of these consumers see when they go to the store—and the price that they would expect to pay—is the retail or "sticker" price of the merchandise that they are interested in purchasing.

17.    Many consumers only learn about Progressive after seeing an advertisement for Progressive in the store or hearing a Progressive sales pitch from a store employee.

*Progressive's Advertisements*

18.    Defendant promotes its rent-to-own payment plans through signage at retail stores, including banners, posters, table tents, and brochures.  While the design and content of the advertisements vary, they frequently promote a "90 day

5

payment option."  The advertisements do not disclose adequately or at all the total

cost of Progressive's rent-to-own products, or any fees, charges, or other costs.

19.    Defendant also allows stores to develop marketing materials for

Progressive's rent-to-own plans, subject to Progressive's review and approval.  In

numerous instances, these materials have represented that consumers will only pay

the retail price, cash price, or "same as cash" price to purchase merchandise

through Progressive or that there are no extra fees, charges, or costs associated

with Progressive's rent-to-own plans.

20.    For example, one retailer has hung a large banner in its store

advertising a "90 day cash option."  Another retailer's website has included a page

where consumers can find information about various finance offers, including

Progressive's rent-to-own offer.  The page has stated that Progressive offers "90

days same as cash with no credit check!"

21.    In 2018, Defendant conducted a review of 200 retailers' online

advertising.  The review found that 37, or 18%, of the retailers represented that

Progressive offers "90 Days Same as Cash" in online advertisements.

*Representations about Progressive's Rent-to-Own Plans*

22.    Defendant also promotes its rent-to-own plans through in-person sales

pitches at the retail stores that offer Progressive's plans.  Progressive contracts with

retailers to pitch its rent-to-own plans to consumers and has hired part-time sales

associates referred to as "Product Sales Specialists" to assist retailers with the

marketing and sale of Progressive's plans.

23.    Pursuant to Progressive's contracts, retailers are required to comply

with Progressive's "Retailer Procedures."  These Procedures set forth various

requirements for interacting with Progressive customers.  Progressive can demand

corrective action to address retailers' deviations from these requirements, up to and

including terminating retailers' relationships with Progressive.

24.    Defendant trains retail sales associates and Product Sales Specialists

on how to pitch Progressive's rent-to-own plans.  Progressive's training materials

mask the true cost of Progressive's plans and include materials directing sales

associates to claim that there are no extra fees, charges, or costs associated with

Progressive's rent-to-own plans.  For example, Progressive's online training course

for sales associates includes instructions on how to answer common questions

posed by consumers.  One such question is:  "What's the interest rate like?"  If

asked this question by a consumer, Progressive advises sales associates to respond:

"There actually isn't an interest rate, because it's not a loan."  Progressive directs

sales associates to refrain from explaining that there *are*, in fact, additional charges

to the consumer; specifically, it instructs that an "incorrect" answer would be:

7

"Well, there's not an interest rate, but if there was an interest rate, it would be something around this much…."

25.     In numerous instances, sales associates and Product Sales Specialists have represented to consumers that they will pay only the retail price, cash price, or "same as cash" to purchase merchandise through Progressive, or that there are no extra fees, charges, or costs associated with Progressive's rent-to-own plans. For example, sales associates and Product Sales Specialists have told some consumers that if they pay in 90 days, they will pay only the "cash price" of the merchandise or that they can pay "90 days same as cash."  Store associates have told other consumers that Progressive's plans have "no interest" or are "interest free."  In other instances, store associates have provided consumers with an inaccurate breakdown of their recurring payments that adds up to the retail price of the merchandise (*e.g.*, $50 per month for 12 months for a $600 item).

*The Application and Contract Signing Process*

26.     Consumers who express an interest in Progressive are directed to complete an application.  The application format has varied over time, but most consumers currently apply using a proprietary Internet-based application platform, known as "Approve.Me."

27.     The Approve.Me platform allows consumers to apply for Progressive or an alternative form of financing (*e.g.*, revolving credit with 0% interest for 12 months) through a single application process.

28.     If consumers elect to apply for an in-store credit offer, they are taken to an application page and asked to enter various demographic and income information.  After submitting the application, consumers are taken to a "Results" page, where they are informed whether their application for the in-store credit offer has been approved.

29.     If consumers' credit applications are denied, consumers are automatically informed that they have been "pre-approved for the Progressive Leasing option!" and asked whether they want to continue.  In some versions of the Approve.Me platform, this message has appeared above the message telling consumers that their credit application was denied, as shown in the example below.



30.     Next, consumers are asked to provide various additional information, including pay frequency, checking account number, and credit card number.

31.     Upon submitting this information, consumers are directed to a "Results" page where they are informed whether they have been approved by Progressive, the maximum amount for which they have been approved, and, in some cases, the maximum rental term for which they have been approved (*e.g.*, 12

months).  To continue, the sales associate then enters a description of the merchandise to be rented and its retail price.

32.    From there, consumers are taken to a "Customer cart review" screen where they can see a description of the item to be rented, the "Cash Price," which is the retail price of the item, the amount of each recurring payment, and the initial payment amount.  Prior versions of this screen have referred to the retail price as the "Lease Total," "Subtotal," or "Invoice Total."  Below is a screenshot of the "Customer cart review" page from a demo version of the Approve.Me platform.



33.    On the same "Customer cart review" page, light gray circles with an "i" inside appear beside the words "**Cash Price**," "Bi-weekly payment," and "Initial payment."  Even if consumers were to notice and click on these circles,

they would not learn the total amount they have to pay.  If consumers click on the "**Cash Price**" circle, a pop-up bubble appears containing the small-print statement: "**Cash price** is the amount you would pay if you purchased the item(s) today." The "Bi-weekly payment" pop-up bubble states:  "Your final payment may vary but will not exceed your recurring payment amount of $75.04," while the "Initial payment" pop-up bubble states:  "**Initial Payment** is the amount you pay today at signing.  This amount will be applied to your 90-day purchase option or included in the total cost."

34.     The "Customer cart review" page also contains a line below the initial payment and regular payment amounts that reads:  "Additional lease details."  The text is the same color and size as the other information on the page and less prominent than the "CREATE MY LEASE" button.  Until approximately August 2019, a light gray down arrow appeared next to the text.  If consumers clicked on the arrow, rather than the more prominent "CREATE MY LEASE" button, the screen displayed the "90-day purchase option" price, "Lease period," "Number of payments," "Cost of lease services," and "Total cost" similar to the following:



35.     If consumers click "CREATE MY LEASE," they are directed to a DocuSign web application, where they are presented with a list of fine-print disclosures about their agreement, but not the total cost or other terms, such as the agreement length or number of payments.  To continue, consumers are prompted to electronically initial each disclosure and sign at the bottom of the page.  Below is a sample screenshot of the disclosures page.

13



36.    Until August 2019, once consumers signed the acknowledgement at the bottom of the disclosures page, the screen auto-scrolled to the last page of the agreement, where consumers were prompted to electronically sign the agreement. Below is what appeared after consumers signed the acknowledgement at the bottom of the disclosures page.



37.     While information about the total cost and other terms were contained on other pages within the agreement, consumers had to manually scroll up from the signature page to find such information.

38.     Upon completing the transaction, consumers have typically received only a receipt from the retailer showing the retail price of the merchandise and sometimes the amount of their initial payment and Progressive's contact information.  The receipt does not show the total cost of Progressive's rent-to-own plans or other payment terms.  Progressive emails consumers a link to their contracts after they have signed, but instructs retailers to provide consumers a printed copy only if they request one.

*The Actual Cost of Progressive's Rent-to-Own Plans*

39.     Contrary to Defendant's representations, unless consumers enter into an agreement with Progressive in California, they will ***always*** end up paying more than the retail price to purchase merchandise through Progressive—often substantially more.

40.     Although the precise terms of Progressive's rent-to-own agreements vary depending on a number of factors, including the state in which the transaction occurs, the retailer from which the merchandise is purchased, and the retail price of the merchandise, the basic terms of Progressive's rent-to-own agreements are largely the same.

41.     The consumer must make an initial payment to Progressive at the time the agreement is signed using a credit or debit card.  The initial payment amount typically ranges from $49 to $79.  In states other than California, the initial payment is a fee that is added to the retail price of the merchandise.  Nevertheless, Progressive instructs sales associates not to call the initial payment a fee.  Once the consumer has signed the agreement and the initial payment has been processed, the consumer may take home the merchandise or schedule delivery of it with the retailer.

42.    At the time the consumer signs the agreement, the consumer is automatically enrolled in a 12-month payment plan (or, in the case of a small set of consumers at certain retailers, a 15-, 18-, or 24-month payment plan) with weekly, biweekly, semi-monthly, or monthly recurring charges, which are automatically debited from the consumer's bank account.

43.    If the consumer makes the initial payment and all of the scheduled recurring payments (the "Total Purchase Price"), the consumer typically will pay approximately ***twice*** the retail price to purchase the merchandise.

44.    Consumers who pay off the merchandise early still pay more than the retail price.  If consumers pay off the merchandise within 90 days of delivery (the "90 Day Payment Option"), they pay the retail price of the merchandise ***plus*** the initial payment or a markup of up to 20% of the retail price ("90 Day Option Amount").  If consumers purchase the merchandise after renting it for more than 90 days but before the end of the full rental term (the "Early Buyout Option"), they pay Progressive a percentage of the remaining balance (typically 65%), plus any amount then due or overdue.  Using the $1,000 mattress from the above application process as an example, if the consumer paid off the mattress after making regular payments for six months, the consumer would end up paying $1,658.58.  This amount is not disclosed to the consumer.

17

45.     Consumers can only use the 90 Day Payment Option if, after signing their agreement, they somehow learn before 90 days have passed that they have been enrolled in a more costly option and call Progressive to increase their regular payment amounts or make additional, unscheduled payments.

46.     Progressive typically charges consumers hundreds of dollars more than the retail price.

**Defendant's Knowledge of Widespread Consumer Confusion and Complaints**

47.     Defendant is aware of widespread consumer confusion about Progressive's rent-to-own plans.

48.     Defendant has received tens of thousands of complaints from consumers saying they were provided inaccurate or misleading information about Progressive's terms or charges, including more than 15,000 complaints from May 2017 through July 2018 alone.  Specific complaints include:

- A consumer purchased $1,100 worth of furniture from a national retailer.  The store associate told her that Progressive was a 12-month interest-free program and told her she would be making 12 monthly payments that, in total, would equal her $1,100 purchase price.  In reality, the consumer's Total Purchase Price was more than $2,000 and the consumer's supposed monthly payments were actually biweekly payments.

- A consumer purchased a $700 cell phone from a national retailer.  The store associate told her that she would just be paying the price of the

phone over 12 months.  In reality, the consumer's Total Purchase Price was nearly $1,700, more than twice the retail price of the phone.

- A consumer purchased a $1,500 mattress from a national retailer.  The store associate told her that if she paid for the mattress within six months of purchase through Progressive, she would pay the cash price.  In reality, the consumer was signed up for a 12-month lease with a Total Purchase Price of more than $3,000.

- A consumer purchased $2,000 jewelry from a national retailer.  The store associate told him that if he paid for the jewelry within 90 days of purchase through Progressive, he would pay the retail price.  In reality, the 90 Day Option Amount was $2,200.

- A consumer purchased $295 jewelry from a local retailer.  The store associate told her that if she paid for the jewelry within 90 days of purchase through Progressive, she wouldn't be charged fees and that her initial payment of $40 went toward her balance.  In reality, the 90 Day Option Amount was $335—the $295 retail price plus the initial payment.

49.     Internal Progressive materials show that Defendant knows consumer confusion about paying the retail price is prevalent.  In a document describing Progressive's categories of consumer complaints, the example provided for the complaint category "Wrong Information Given" is:  "The retailer gave the customer impression that they had a 90 day same as cash option and did not explain the mark up."  Similarly, an example provided for the complaint category "90-Day Buyout Option" is:  "The customer did not understand the cash price would be higher than the invoice amount by the IP [initial payment]."

19

50.     Similarly, in a training presentation to Progressive's customer service representatives, examples of reasons why consumers complain include:  the plan was "explained as 90 days same as cash," the consumer "didn't know the amount owed would go up after 90 days," and the consumer "didn't know the initial payment wouldn't go toward the amount owed."

51.     Retailers have also flagged concerns with the training materials.  For example, in 2016, a regional director sent Progressive employees an email relaying the concerns of a sales associate who had taken the training course.  The sales associate found the answer to the question "what's the interest rate like?"—*i.e.*, "there actually isn't an interest rate, because it's not a loan"—deceptive. Specifically, the sales associate wrote:

> This is false because there is, in fact, a form of interest and telling a guest there's no interest when they see in the final paperwork that they're actually paying 150% more (give or take) at 12 months would make us look like shady sales people.

Nevertheless, this question and answer continue to appear unchanged in the online training course.

52.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

53.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

54.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I

55.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of rent-to-own plans, Defendant represents, directly or through retailers, expressly or by implication, that consumers will pay the retail or cash price to purchase merchandise.

56.    In truth and in fact, in numerous instances in which Defendant has made the representations set forth in Paragraph 55, consumers who entered into a rent-to-own agreement with Progressive paid more than the retail or cash price to purchase the merchandise, often substantially more.

57.    Therefore, Defendant's representations as set forth in Paragraph 55 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

58.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act.  In addition, Defendant has been unjustly enriched as a result of its unlawful acts or practices. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

59.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency

of this action and to preserve the possibility of effective final relief, including a preliminary injunction;

B.      Enter a permanent injunction to prevent future violations of the FTC Act by Defendant;

C.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the FTC Act, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel


Dated:  __4/20/20_____          __/s/ Thomas Widor_____
                                          THOMAS J. WIDOR
                                          MIYA TANDON
                                          SAMUEL JACOBSON
                                          BRITTANY FRASSETTO
                                          Federal Trade Commission
                                          600 Pennsylvania Avenue, NW
                                          Mail Stop CC-10232
                                          Washington, DC 20580
                                          Telephone:  (202) 326-3039 (Widor)
                                          (202) 326-2351 (Tandon)
                                          (202) 326-3251 (Jacobson)
                                          (202) 326-2774 (Frassetto)
                                          Fax:  (202) 326-2752
                                          Email:  twidor@ftc.gov, mtandon@ftc.gov,
                                          sjacobson@ftc.gov, bfrassetto@ftc.gov

                                          ROBIN L. ROCK, GA. Bar No. 632529
                                          Federal Trade Commission
                                          225 Peachtree St. NE, Suite. 1500
                                          Atlanta, GA 30303
                                          Telephone:  (404) 656-1368
                                          Fax:  (404) 656-1379
                                          Email:  rrock@ftc.gov

                                          Attorneys for Plaintiff
                                          FEDERAL TRADE COMMISSION